**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**July 17, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

DOUGLAS SCOTT,

      Plaintiff-Appellant,

v.

DIRK KEMPTHORNE,[*] Secretary of
the United States, Department of the
Interior,

      Defendant-Appellee.

No. 04-8043

(D.C. No. 03-CV-153-D)

(D. Wyo.)

---

**ORDER AND JUDGMENT**[**]

---

Before **BRISCOE, HARTZ**, Circuit Judges, and **HERRERA**, District Judge.[***]

---

This is an appeal from the district court's grant of summary judgment in

favor of the defendant-appellee. We exercise jurisdiction pursuant to 28 U.S.C. §

1291 and, finding no error, affirm the district court.

---

[*] Pursuant to Fed. R. App. P. 43(c)(2), Dirk Kempthorne, Gale A. Norton's
successor, has been automatically substituted as a party to this appeal.

[**] This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. We generally disfavor the citation of
orders and judgments; nevertheless, an order and judgment may be cited under the terms
and conditions of Tenth Circuit Rule 36.3.

[***] The Honorable Judith C. Herrera, United States District Judge for the District
of New Mexico, sitting by designation.

BACKGROUND

In 1986, Yellowstone National Park hired Douglas Scott as a seasonal bio-technician. Eventually, Yellowstone converted Scott's employment to a term appointment[1] as a wildlife biologist, which it renewed annually for several years. On October 27, 1993, Yellowstone again renewed Scott's employment, granting him a term appointment not to exceed October 26, 1994. Yellowstone employed Scott in large measure to work on research regarding the appropriateness of hunting the Montana-Yellowstone Pronghorn Herd, a particular species of antelope. During October of 1993, Scott asserted that Yellowstone gave preferential treatment in hiring to female staff employees, and on November 10, 1993, he filed a formal EEO complaint to that effect.

In December of 1993, Secretary of the Interior Bruce Babbitt created the National Biological Survey ("NBS"), a new federal agency to be staffed by moving all of the research scientists and their funding from the National Park Service and other agencies of the Department of Interior to the NBS. Because Scott was involved in scientific work, Yellowstone placed him on a list of employees to be transferred to the new agency. However, the NBS accepted only the permanent, full-time scientists, rejecting all employees on term appointments, including Scott. Those "less than full-time persons" were to remain with the

---

[1] Term appointments are not permanent positions, but rather appointments for a fixed period not to exceed four years.

National Park Service, which no longer had funding or a scientific mission for those personnel because all of its scientific functions had been transferred to the NBS. As a result of this lack of funding, on January 1, 1994, Yellowstone converted Scott's and several other employees' positions from term appointments to "non-pay, intermittent status" positions.[2]

After his appointment became non-pay, Scott continued his research at Yellowstone on a voluntary basis. In February of 1994, he pled guilty to two separate counts of violating Montana state game laws by misrepresenting his state of residence in order to obtain resident hunting licenses. The following month, an official with the Montana Department of Fish, Wildlife, and Parks informed Scott's superiors at Yellowstone of his violations of the Montana game laws.

On March 16, 1994, Scott met with officials from the National Park Service who informed him that he was being discharged for cause due to his violations of Montana's wildlife resource laws. Those officials stated that Scott's hunting license violations were incompatible with his research on the pronghorn antelope, which was partially funded by the State of Montana. The government also presented to the district court evidence, in the form of affidavits, that a hunting license violation by one of its employees was a source of embarrassment and stigma to the National Park Service, which is charged with wildlife resource

---

[2] An employee is placed on intermittent status when limited funds are available or the activity for which he was hired requires him to work only at certain times of the year.

management.

On March 17, 1994, government officials again met with Scott at his request. Scott requested that they change the official reason for his termination from "for cause" to lack of work or lack of funds in order to protect his professional reputation. Scott also expressed concern that a termination for cause would result in his loss of unemployment benefits. In return for this change in the reason for his termination, Scott offered to withdraw his November 1993 EEO Complaint alleging sex discrimination. This proposal was attractive to Yellowstone, in part because it wished to have access to the data and other research collected by Scott, something that was unlikely if he were terminated for cause. After several additional meetings between Scott and government officials, Yellowstone officially changed Scott's termination status from "for cause" to "lack of funding" and permitted Scott to continue the use of his office and government housing through May 28, 1994, in order to complete his work. On April 5, 1994, Scott executed a "Statement of Withdrawal" with regard to his EEO Complaint, wherein he stated, "I have not been intimidated, coerced, nor any conditions placed on me to withdraw my complaint."

On July 25, 1994, Scott filed a second EEO complaint in which he asserted that the National Park Service had retaliated against him for his prior EEO activity by threatening to terminate his employment unless he withdrew his first EEO charge. Scott also stated that his agreed upon reason for termination—lack

of funding—was untrue because Yellowstone had received additional funding. After a two day hearing in which he reviewed exhibits and took witness testimony, an administrative law judge concluded that Scott had failed to prove his claims and was bound by his prior withdrawal of his EEO claims. On July 9, 2002, Scott filed his Amended Complaint in the United States District Court for the District of Montana in which he claimed that the government had retaliated against him for his protected EEO activities. The case was transferred to the District of Wyoming, and on March 26, 2004, the district court granted the government's motion for summary judgment.

This appeal followed.

## DISCUSSION

### I.    Standard of Review

We review <u>de novo</u> the district court's ruling on the Government's motion for summary judgment. See <u>Welding v. Bios Corp.</u>, 353 F.3d 1214, 1217 (10th Cir. 2004). Summary judgment is appropriate when the pleadings, deposition transcripts, affidavits and evidentiary material show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. <u>See</u> Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). Summary judgment will be granted to defendant if plaintiff "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."

Celotex Corp., 477 U.S. at 322. "Thus, to survive summary judgment the plaintiff has the burden to put forth sufficient evidence to warrant a verdict as a matter of law; a scintilla of evidence will not suffice." Lanman v. Johnson County, 393 F.3d 1151, 1154-55 (10th Cir. 2004).

## II.     Scott's Retaliation Claim

Like the district court, we must evaluate the merits of the defendant's motion for summary judgment pursuant to the shifting allocation of burdens of proof set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). First, the burden is on the plaintiff to come forward with evidence on every element of his prima facie case. See id. at 802. To establish a prima facie case of retaliation under Title VII, a plaintiff must demonstrate that (1) he was engaged in protected opposition to discrimination; (2) that a reasonable employee would have found the challenged action materially adverse; and (3) a causal connection existed between the protected activity and the materially adverse action. Burlington N. & Santa Fe Ry. Co. v. White, --- U.S. ----, 126 S.Ct. 2405 (2006); Argo v. Blue Cross and Blue Shield of Kansas, Inc., --- F.3d ---, 2006 WL 1806605, at *7 (10th Cir. Jul. 3, 2006).[3] Once the plaintiff establishes his prima facie case, "the

---

[3] This Court had previously held that a retaliation plaintiff must allege and prove that he was subject to an "adverse employment action." Miller v. Auto. Club of N.M., Inc., 420 F.3d 1098, 1119 (10th Cir. 2005). Under Burlington, that is no longer the correct standard. Instead, to prevail on a Title VII retaliation claim, a plaintiff need only show "that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have "dissuaded a reasonable worker from making or supporting a charge of discrimination." ' " Burlington, 126 S.Ct. at 2415

burden shifts to the employer to offer a facially legitimate rationale for the materially adverse action. The burden then shifts back to the plaintiff to show the employer's explanation is pretext." Id. at 1120.

In granting summary judgment in favor of the defendant, the district court relied on two separate rationales to support its ruling. First, when analyzing Scott's prima facie case, the district court found that he had failed to establish the existence of a causal connection between his protected activity and the materially adverse action. In reaching that conclusion, the district court applied the "but-for" test adopted by the Fourth, Fifth, Seventh, and Ninth Circuit Courts of Appeals. See, e.g., Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1064-65 (9th Cir. 2002); Dunn v. Nordstrom, Inc., 260 F.3d 778, 784 (7th Cir. 2001); Mayberry v. Vought Aircraft Co., 55 F.3d 1086, 1092 (5th Cir. 1995); Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985), abrogated by Price Waterhouse v. Hopkins, 490 U.S. 228 (1989). This standard requires a plaintiff to prove "that 'but for' the protected activity she would not have been subjected to the action of which she claims." Jack v. Texaco Research Ctr., 743 F.2d 1129, 1131 (5th Cir. 1984). In the alternative, the district court also found that Scott had failed to demonstrate that the legitimate, nondiscriminatory reasons proffered by the government in support of the materially adverse action were

_____

(quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006) (quoting Washington v. Ill. Dep't of Revenue, 420 F.3d 658, 662 (7th Cir. 2005)).

mere pretext for discrimination. Because we agree that Scott failed to demonstrate that the government's reasons for his termination were pretextual, we need not reach the question of whether the district court should have applied the "but-for" test.

Under Tenth Circuit precedent, a plaintiff may demonstrate that the employer's legitimate, non-discriminatory reason for the materially adverse action is mere pretext by pointing to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997) (quoting Olson v. Gen. Elec. Astrospace, 101 F.3d 947, 951-52 (3d Cir. 1996)). Typically, a plaintiff may show pretext in one of three ways:

> (1) with evidence that defendant's stated reason for the [materially adverse action] was false; (2) with evidence that the defendant acted contrary to a written company policy prescribing the action taken by the defendant under the circumstances; or (3) with evidence that . . . he was treated differently from other similarly-situated employees who violated work rules of comparable seriousness.

Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1230 (10th Cir. 2000) (internal citations omitted). With regard to pretext, the question is whether the employer honestly believed its non-discriminatory reason. Whether the employer was mistaken or its decision foolish is of no moment; rather, the issue is whether

its proffered reason is sincere. Stover v. Martinez, 382 F.3d 1064, 1076 (10th Cir. 2004). Finally, a plaintiff must provide specific facts showing that the employer's reasons for its materially adverse action are pretextual; a generalized suspicion is not enough. Salguero v. City of Clovis, 366 F.3d 1168, 1176 (10th Cir. 2004).

In this case, the government offers two legitimate, non-discriminatory reasons for terminating Scott's employment. First, the government has demonstrated that the research functions performed by Scott, as well as the funding for those functions, were transferred to the NBS—an entirely separate agency—leaving Scott without viable employment at Yellowstone. Thus, the burden shifts to Scott to set forth evidence to support an inference that this reason for his termination was mere pretext. Scott cites to defense counsel's opening statement at the administrative hearing that "there was still the work to be done; there was still funds for the work to be done" as evidence that this explanation for his termination was pretextual. However, Scott misleadingly quotes only the first half of defense counsel's sentence, the second half of which states: "but the work was now the responsibility of NBS and not Yellowstone National Park. The funds were now in the bank for NBS and not Yellowstone National Park." Thus, when viewed as a whole, it is clear that defense counsel's statement contains no concession or judicial admission as Scott contends, but rather is consistent with the government's position that the work and funding had been transferred to

-9-

another agency, thereby justifying Scott's dismissal from Yellowstone.

Scott also argues that there is no evidence that any other "term" or "non-pay, intermittent status" employees were terminated early due to the transfer of money and research to NBS, which indicates that he received disparate treatment. Under McDonnell Douglas, however, it is not the government's burden to come forward with evidence that its legitimate, non-discriminatory reason is not pretextual—that is, evidence that it treated all similarly situated employees the same as Scott. Rather, Scott has the affirmative burden to demonstrate pretext. One primary method of doing so is to show that he was treated differently from other similarly-situated employees. See Kendrick, 220 F.3d 1220, 1230 (10th Cir. 2000). Scott has not met his burden to come forward with such evidence, and it is not sufficient for him merely to point to the absence of evidence in the record.

The government also presented evidence of its second legitimate, non-discriminatory reason for terminating Scott's employment: that he violated Montana's hunting license laws and that such violations were both embarrassing to the National Park Service and inconsistent with Scott's research on the Montana-Yellowstone Pronghorn Herd. Scott argues that this reason is pretextual because other employees of the National Park Service engaged in similar infractions yet suffered no materially adverse action. Again, Scott fails to point to evidence in the record to support his assertions. Scott argues that an unidentified "park officer" received a citation for driving under the influence yet

-10-

received no punishment. However, Scott fails to cite evidence that supports this assertion or that explains how the officer was similarly situated to Scott. Scott also points to testimony that indicates that his supervisor's son received a citation for violating hunting laws, yet received no materially adverse action. However, the testimony that Scott cites does not clearly indicate whether his supervisor's son was even employed by Yellowstone at the time of his violation, what the scope of his employment was, what the nature of his infraction was, or what the consequences were that he may have suffered as a result. In fact, the testimony that Scott cites reveals that the witnesses questioned on the topic had very little information about the event in question. Scott also argues that his infractions were not serious enough to justify his termination because his supervisor had to "make his case" to other officials that Scott should be terminated. The testimony Scott cites, however, simply does not support his version of events.

Finally, Scott cites to testimony from one government official who stated that Scott was not ultimately discharged for hunting license violations. While this is an accurate description of the official's testimony, it does nothing to establish pretext. There is no dispute in the record that initially Yellowstone terminated Scott's employment because of his violations of Montana hunting laws, but ultimately agreed to change the official reason for his termination to lack of work and lack of funding. The unchallenged evidence shows that both lack of funding and wildlife resource law violations were valid reasons for ending the

employment relationship, and that ultimately the government settled on the former at Scott's urging. Scott has not come forward with evidence to demonstrate that his failure to comply with Montana state hunting laws was not the true reason for the materially adverse action.

In light of the foregoing, we conclude that the district court did not err in granting the government's motion for summary judgment. Having carefully reviewed the briefs, the record, and the applicable law, we AFFIRM the judgment of the district court.

Entered for the Court


Judith C. Herrera
District Judge